

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| **MAURA O'NEILL,**<br><br>        Plaintiff,<br>v.<br><br>**NORTHEAST GEORGIA MEDICAL CENTER,**<br><br>        Defendant. | **CIVIL ACTION FILE NO.:**<br>**2:21-CV-125-RWS**<br><br>1. Invasion of Privacy, O.C.G.A. § 16-11-62<br>2. Fraud<br>3. Civil RICO, 18 U.S.C. § 1962(c)<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff Maura O'Neill brings this action against Defendant, and under penalty of perjury, states as follows:

## PARTIES

1. Plaintiff Maura O'Neill previously lived in Georgia. She has a mailing address at 712 H Street, NE, #1707, Washington, DC 20002.

2. Northeast Georgia Medical Center ("NGMC Gainesville") is a health care organization located in Gainesville, Georgia. It has an address at 743 Spring Street NE, Gainesville, GA 30501. NGMC Gainesville is part of the Northeast Georgia

1

Health System ("NGHS") and includes hospitals, urgent care centers, rehabilitation centers and longer-term care facilities.

## JURISDICTION & VENUE

3. This Court has diversity of citizenship jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332.

4. This Court has subject-matter jurisdiction over Plaintiff's federal claim, arising under the laws of the United States, pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over Plaintiff's state-law claims, pursuant to 28 U.S.C. § 1367, because they are related to the federal claims and form part of the same case and controversy.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

**A. Temporary Loss of Peripheral Vision and Evaluation from NGHS**

6. On June 5, 2019, Plaintiff was sitting down when she briefly lost her peripheral vision in both eyes for less than three minutes. Shortly thereafter, she also had a minor headache that did not last more than three hours. Given the events were unusual, Plaintiff called a doctor. The doctor told her that she should

2

be checked, but did not mention that the symptoms were caused by any particular factor. In fact, many different factors could have caused temporary and reversible loss of peripheral vision and a minor headache. The doctor also did not state Plaintiff had to see a doctor immediately or that Plaintiff should limit or change her activities.

7. The following day, Plaintiff went to a NGHS urgent care provider. Plaintiff was informed she could have had a "stroke," and was advised to take an ambulance to the hospital for an evaluation. She was informed that driving by herself to the hospital was against medical advice ("AMA"), and she was advised to call an ambulance to drive her the short distance to NGMC Gainesville.

8. Given Plaintiff felt completely fine, did not believe she had a stroke, and the loss of peripheral vision had occurred the day before and disappeared, O'Neill drove to NGMC Gainesville for a CT scan.

9. Plaintiff was admitted to NGMC Gainesville, and explained her symptoms to tirage nurse, nurse, and doctor.

10. Plaintiff was subsequently given CT and MRI scans. Both showed no sign of stroke.

3

11. Plaintiff asked for a simple urine test to test for a drug that would have caused the loss of peripheral vision given loss of peripheral vision is a side effect of numerous drugs. Plaintiff's request was denied. No explanation was provided.

12. Plaintiff was discharged.

13. O'Neill's medical record from NGMC Gainesville states Plaintiff was informed by the doctor that she had a "migraine," however, this is not the case and O'Neill's symptoms and medical history clearly and easily show a migraine fails to account for even the basic criteria to be considered a migraine.

14. More specifically, in order to qualify as a migraine, Plaintiff would have had to have experienced at least five attacks and the headache would have to needed to lasted for 4-72 hours (untreated or unsuccessfully treated). In addition, the headache was required to have had two or more of the following characteristics: (a) unilateral location, (b) pulsating quality, (c) moderate or severe pain intensity, (d) aggravation by or causing avoidance of routine physical activity (e.g., walking, climbing stairs). Yet, O'Neill did not experience any of these symptoms since the headache was on both sides of her head, did not have a pulsating quality, was mild rather than moderate or severe, and O'Neill drove, eat, walked, shopped, read, and conducted all her normal activities.

15. In addition, during the headache in question on June 5, 2019, Plaintiff was required to experience at least one of the symptoms of (a) nausea and/or vomiting, and/or (b) photophobia and phonophobia. However, Plaintiff did not experience any of these symptoms.

16. The only time Plaintiff has had a loss of peripheral vision was on June 5, 2019, and Plaintiff has never experienced a migraine. The minor headache Plaintiff had on June 5, 2019, did not last more than four hours, Plaintiff was able to drive and conduct all her normal activities, and Plaintiff did not experience nausea, vomiting, photophobia or phonophobia.

17. Had the doctor or one of the nurses asked O'Neill basic questions or taken her headache history, which the doctor did not do, then the physician would have known that claiming O'Neill had a migraine was completely inappropriate and did not make sense in the circumstances. Among other things, migraines must be recurring, and O'Neill has never had a migraine.

18. In addition, the medical record is incorrect in stating the physician told Plaintiff it was a "migraine." Given migraine does not make sense given O'Neill's history and symptoms, it is doubtful that a physician would state O'Neill suffered from a migraine.

5

19. After Plaintiff was informed that the CT and MRI scans showed no signs of stroke, and her request for a urine test were denied, Plaintiff knew her medical care was a fraud given there was no reasonable explanation from NCMC Gainesville for the symptoms she experienced, nor did NGMC Gainesville make any effort to determine the cause of O'Neill's symptoms.

20. Given the medical record reflects the fact no effort was made to determine if O'Neill ever experienced any migraine symptoms or migraines in the past, migraines have very specific symptoms, and Plaintiff did not meet the criteria as described above, then the physician did not seriously consider a migraine while Plaintiff was at NGMC Gainesville or inform O'Neill that migraine was a possibility.

21. Informing a patient that driving a short distance to a hospital for evaluation is AMA due to stroke, a potentially deadly medical condition, and then pivoting to no rational explanation for a temporary loss of vision within a few hours is not reasonable.  If the symptoms were serious enough to advise someone not to drive, then they were serious enough to warrant basic questions about medical history and a reasonable attempt to explain why O'Neill briefly lost peripheral vision. Thus, NGMC Gainesville's efforts were clearly not credible in any way.

## B. Subsequent False Claims of Stroke

22. Given there was no evidence of a stroke on the CT or MRI, O'Neill did not expect to ever hear about the events that occurred on June 5-6, 2019 or her time at NGHS from a third party ever again. However, this is not what transpired.

23. Instead, over a year later, in May and June of 2020, O'Neill learned that the fake "stroke" story and events that transpired at NGHS were used by the New York City Police Department ("NYPD") to justify closing a drug facilitated sexual assault case O'Neill reported that occurred at the Shelburne Hotel & Suites (the "Shelburne" or "Shelburne Hotel") in Manhattan in January of 2018.

24. While O'Neill promptly reported the sexual assault, and the NYPD had male DNA evidence on a rape kit, the NYPD withheld this evidence from Plaintiff in violation of 18 U.S.C.A. § 3772 (a)(2)(B) until O'Neill was forced to file a petition to compel the NYPD to release the records it possessed.

25. In fact, on June 17, 2019, shortly after O'Neill's visit to NGMC, Plaintiff was forced to file an Article 78 proceeding (the "Article 78 Petition" or the "Petition") pursuant to the Freedom of Information Law ("FOIL") and New York Public Officers Law § 84 et seq. to compel the NYPD to disclose the records the

7

NYPD maintained that were the subject of Freedom of Information Law Request #: FOIL-2019-056-02789 (the "FOIL Request").

26. Over a year after filing the Petition, O'Neill learned that the NYPD's rationale for closing the case was that the NYPD was provided with a video of Plaintiff with an unnamed John Doe at the Shelburne Hotel.

27. However, there is a significant problem with the videos. Namely, the videos showed Plaintiff had significant language deficits. To cover for the obvious speech problems and seek to validate the abusive act of videotaping a helpless victim, it was falsely claimed Plaintiff had a "stroke."

28. If someone was having a stroke, the people videotaping her should have called 911. However, it was obvious that the real reason those taping and in the videos did not call 911 was because they knew O'Neill was not having a stroke because they had drugged Plaintiff. Under the New York Penal Code, physically helpless and/or mentally incapacitated people cannot consent to sexual activity (e.g., Penal Law § 130.35(2), Penal Law § 130.50(2), Penal Law § 130.65(2)).

29. Given physical helplessness and mental incapacitation are explicitly defined in the New York penal code, it is simply not believable that the NYPD did not know that the video "evidence" the NYPD used to close the case and subsequently

8

defame O'Neill by claiming she was "crazy" and a "liar" ignored the penal code since someone who is physically helpless and/or mentally incapacitated cannot consent to sexual activity (e.g., Penal Law § 130.35(2), Penal Law § 130.50(2), Penal Law § 130.65(2)).

30. What the videos actually show is that O'Neill was drugged to facilitate sexual assault. By New York law, someone who has been given drugs to facilitate sexual assault is also unable to consent to sexual activity. (e.g., Penal Law § 130.00(6), Penal Law §§ 130.30(2)). Thus, the "evidence" the NYPD used to close the case and undermine and discredit O'Neill proves crimes, not that she is crazy or a liar.

31. Shooting a video of a drugged person and using it to harm her is clearly abuse. The fact the NYPD used this form of obvious abuse to further harm Plaintiff is horrific.

32. In order to justify the utterly absurd claim Plaintiff had a stroke, from February through April of 2021, Plaintiff has been told she has "high blood pressure" even though her blood pressure is on the low end of the range.

33. Despite the fact, the American Heart Association explicitly states in its guidelines that are posted on its website that high blood pressure readings should

9

be "consistently" above the advised range over time and "diagnosed" by a physician, these guidelines were completely ignored the same way NGMC totally ignored the guidelines for stroke and migraine.[1] Instead, O'Neill has repeatedly had to deal with ludicrous statements from medical professionals about her "high blood pressure."

## CLAIM FOR RELIEF

### Count One: Invasion of Privacy

34. Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

35. O'Neill had a right of privacy, protected by O.C.G.A. § 16-11-62. Her rights included informational privacy, meaning an interest in precluding the dissemination or misuse of confidential information.

36. O'Neill reasonably expected to maintain the privacy and confidentiality of her visit to NGHS since O'Neill did not tell anyone she was going to NGHS. Further, O'Neill reasonably expected to keep her visit to NGMC private, and

---

[1] *Source: American Heart Association: https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings.*

not have any information discussed in her visit disclosed to any third party. Nor did she expect anyone at NGMC to speak to anyone else about her.

37. O'Neill has never signed a power of attorney and no one has a legal right to speak about O'Neill's confidential information, medical history, or medical information.

38. In addition, there is no Power of Attorney on file with NGHS and no record of conversations with third parties were described in the medical record even though a conversation with a third party clearly occurred.

39. O'Neill reasonably expected she was having a private consultation with NGMC, and no one from NGMC would discuss her with any other third party without her knowledge or consent.

40. However, despite the fact NGMC had a duty to keep O'Neill's medical records private due to The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), confidential information about O'Neill's trip to NGMC was disclosed to other parties without O'Neill's knowledge or consent, and the NYPD used information about O'Neill's visit to NGMC and the fake "stroke" story to close its criminal case and defame Plaintiff.

41. NGMC's conduct constituted a serious invasion of O'Neill's privacy, causing her damages.

## Count Two: Fraud

42. Plaintiff restates and realleges each of the foregoing paragraphs in this pleading with the same force and effect as if fully set forth within.

43. NGHS claims on its website that it is "dedicated to improving the health and quality of the people of Northeast Georgia."[2]

44. Plaintiff was informed that she would be appropriately evaluated at NGMC, and O'Neill justifiably relied on these representations and the claims on NGHS's website. However, Plaintiff's request for appropriate testing was denied, and after the CT and MRI scans showed no sign of stroke, Plaintiff was given no explanation for the cause of her symptoms.

45. The statement in the medical record that the symptoms were attributable to a migraine are not only not consistent with any medical standards, but it is false that in June of 2019, O'Neill was informed that her symptoms were attributable to a "migraine," presumably because no medical history about migraines was even

---

[2]Source: NGHS website: https://www.nghs.com/about.

taken, and Plaintiff has no history of migraines or migraine symptoms and recurrence is a necessity to diagnosis migraines.

46. Clearly, as shown through the medical records, NGMC had no intention of evaluating the true cause of Plaintiff's loss of peripheral vision since no effort was made to determine the cause of the loss of the peripheral vision after the scans were negative, and Plaintiff's request for a urine test was denied without explanation.

47. Instead, the fake "stroke" story, generated by NGMC Gainesville, was used to materially harm Plaintiff even though the MRI and CT scan showed there was no evidence of a stroke, Plaintiff had no risk factors for stroke (e.g., she has not used any illegal drugs and there is no family history of cardiac problems with female members of her family)[3], and given her age, it was statistically unlikely she had a stroke.

---

[3]Male members of Plaintiff's father's family have had a history of cardiovascular events, however, to Plaintiff's knowledge, no female members of her father's family have any history of heart attacks or strokes. In addition, even the male members of her father's family do not experience cardiovascular events until they are over the age of 60.

48. Since the NYPD closed the case based on the fake "stroke" story, Plaintiff has had to deal with a series of additional crimes used to cover-up for the NYPD's and rapists's crimes.

49. NGMC's conduct constituted serious harm to O'Neill, causing her damages.

## Count Three: Civil RICO, 18 U.S.C. § 1962(c)

50. Plaintiff restates and realleges each of the foregoing paragraphs in this pleading with the same force and effect as if fully set forth within.

51. Since 2017 Plaintiff has been forced to disprove a series of false and ludicrous medical claims including, but not limited to (1) she belonged in a "mental institution," (2) had "delusions of grandeur," (3) exhibited "pressured speech" and was "bi-polar," (4) was an opioid addict, (5) suffered from paranoid schizophrenia, (6) had a stroke, (7) suffered from "migraines," and had (8) high blood pressure.

52. However, as Plaintiff has proven each story false, each story is simply replaced with a new story, the same way the "stroke" story was replaced with the "migraine" story even though there is not any factual basis to claim Plaintiff had either a "stroke" or a "migraine."

14

53. On May 10, 2021, Plaintiff submit six requests for medical records from hospitals in which she had rape exams conducted. She expected to receive the records in a week or two. However, at this point she has only received two complete medical records.

54. Without the full medical records, Plaintiff is unable to fully state a cause of action for RICO since the medical providers that conducted rape exams, like NGMC, also denied Plaintiff's requests for appropriate tests, changed stories, failed to ask for a medical history, and wrote false statements in Plaintiff's records.

55. In addition, the medical records from rape exams also contain several "conversations" that never occurred, and fail to contain conversations that did occur. In several cases, hospitals also refused to collect a urine sample, or ensured evidence was destroyed.

56. In those cases, as in this case, fake "medical" stories and fake "medical" claims were provided to the police as justification for closing criminal cases and harming Plaintiff.

57. It is statistically impossible for someone like O'Neill to have experienced the problems that she has experienced due to "bad luck" or random coincidence. Rather, it is obvious there has been a consistent and concerted campaign

undertaken to undermine and discredit Plaintiff in order to harm her and aid and abet those who have clearly repeatedly and consistently abused her to cover for their various and numerous crimes.

58. Defendant's conduct described above in this pleading were wanton, willful and malicious, shocking to the public conscience, deplorable, and outrageous. Defendant's atrocious actions exhibited malice, fraud, oppression, wantonness, and aggravated circumstances which effect the public interest. Defendant's behavior clearly demonstrated "malicious intent" to injure the Plaintiff, and gross, wanton and willful morally culpable conduct that entitles the Plaintiff to receive punitive damages. Such an award is necessary and required to serve as a warning to others, punish gross misbehavior, and protect the public good.

59. As a direct and proximate result of Defendant's actions, O'Neill has been and continues to be injured in an amount to be determined at trial, and seeks compensatory and punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests judgment in her favor and against Defendant as follows:

a. Compensatory damages in an amount to be determined at trial;

b. Punitive damages;

c. Fees, costs, and expenses;

d. Pre-judgment and post-judgment interest; and

e. A grant of further relief this Court should find just and proper.

## DEMAND FOR JURY TRIAL

**NOW COMES** Plaintiff and hereby demands a jury trial in this matter.

Dated: Baltimore, MD  
June 5, 2021

Respectfully submitted,

BY: *Maura O'Neill*  
Maura O'Neill, Plaintiff  
712 H Street NE, #1707  
Washington, DC 20002  
(752) 228-9105  
moneill@rahillco.com

17

## **CERTIFICATION**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated:  Baltimore, MD  
June 5, 2021

Respectfully submitted,

BY: *Maura O'Neill*  
Maura O'Neill, Plaintiff  
712 H Street NE, #1707  
Washington, DC 20002  
(752) 228-9105/moneill@rahillco.com

18

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MAURA O'NEILL,<br><br>    Plaintiff,<br>  v.<br><br>NORTHEAST GEORGIA<br>MEDICAL CENTER,<br><br>    Defendant. | CIVIL ACTION FILE NO.<br>1:20-cv-04632-JPB |

**LR 7.1(D) FONT COMPLIANCE CERTIFICATION**

The undersigned certifies that the within and foregoing **COMPLAINT** was prepared using Times New Roman 14 point font in accordance with Local Rule 5.1 of the United States District Court for the Northern District of Georgia.

Dated: Baltimore, MD
June 5, 2021

Respectfully submitted,

BY: *Maura O'Neill*
Maura O'Neill, Plaintiff
712 H Street NE, #1707
Washington, DC 20002
(752) 228-9105
moneill@rahillco.com

19